IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| M.D.B.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, Commissioner of Social Security[2] | : | NO. 25-1320 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J. August 31, 2026

Plaintiff, who received supplemental security income ("SSI") benefits as a child, filed this appeal from the Commissioner's decision finding that he was no longer disabled as of September 1, 2020. For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand the case for further consideration.

## I. PROCEDURAL HISTORY

Plaintiff received SSI based on his disability as a child, having been found disabled on January 1, 2005, when he was three years old. See tr. at 145 (Disability

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using his initials. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Throughout the administrative proceedings, Plaintiff proceeded pro se and filed a pro se Complaint in this court, naming the Social Security Administration as the defendant. Doc. 1 at 2. Frank Bisignano was appointed Commissioner of Social Security on May 6, 2025. Pursuant to Rule 17(d) of the Federal Rules of Civil Procedure, Mr. Bisignano is the proper defendant in the case. No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

Hearing Officer's Decision noting finding of disability effective January 1, 2005). However, once Plaintiff reached 18 years of age on November 16, 2019, and an updated assessment was made consistent with the Commissioner's procedures. Unitizing the definition of disability applicable to adults, it was determined that he was not disabled as of September 1, 2020, and his SSI payments ceased. Id. at 94; see also id. at 115 (response to September 21, 2020, denial letter); 20 C.F.R. § 416.987 (rules governing disability redeterminations for individuals who attain age 18); 42 U.S.C. § 1382c(a)(3)(H)(iii) (requiring use of criteria for determination of initial eligibility for adults in redetermining eligibility when a recipient reaches 18 years of age). Plaintiff filed a request for reconsideration. Tr. at 115. His claim for continuation of benefits was denied on reconsideration. Id. at 150-52.

On September 22, 2022, Plaintiff requested a hearing before an ALJ. Tr. at 154-55. After holding a hearing on November 30, 2023, id. at 54-83, the ALJ denied Plaintiff's claim for SSI on January 5, 2024. Id. at 37-46. On November 24, 2024, the Appeals Council denied Plaintiff's request for review, id. at 27-29, making the January 5, 2024 decision of the ALJ the final decision of the Commissioner. 20 C.F.R. § 416.1481.

On March 10, 2025, Plaintiff sought review in federal court. Doc. 1.[3] The matter is fully briefed. Docs. 25-27. The case was originally assigned to my colleague, the Honorable Elizabeth T. Hey, see Doc. 5, and subsequently reassigned to me. Doc. 15.[4]

## II. LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

---

[3]Although the Complaint was filed more than 60 days after the Appeals Council's decision, the Appeals Council extended the time for Plaintiff to seek review in the federal court, rending his Complaint timely. Tr. at 4.

Plaintiff filed his Complaint pro se, but asked the court to appoint counsel. See Docs 1 & 7. The court appointed Thomas Sutton, Esquire, who filed Plaintiff's Brief and Statement of Issues. Docs. 9 & 25.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Docs. 14 & 17.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

<u>See</u> <u>Zirnsak</u>, 777 F.3d at 610; <u>see also</u> 20 C.F.R. § 416.920(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC. <u>See</u> <u>Poulos v. Comm'r of Soc. Sec.</u>, 474 F.3d 88, 92 (3d Cir. 2007).

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims

In his January 5, 2024 decision, the ALJ found that Plaintiff was eligible for SSI as a child until the month before he turned 18 years of age on October 15, 2019, and that "he was found no longer disabled as of September 1, 2020, based on a redetermination of disability under the rules for adults who file new applications." Tr. at 39. At step two, the ALJ found that Plaintiff had the following severe impairments: attention deficit hyperactivity disorder ("ADHD") and a learning disorder. Id. At the third step, the ALJ found that since September 1, 2020, Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." Id. The ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels but that his impairments limit him to "performing simple, routine, and repetitive tasks, in a work environment free of fast paced production requirements, one that involves only simple work related decisions, with few if any changes in the workplace." Id. at 42. At the fourth step, the ALJ found that Plaintiff has no past relevant work. Based on the Plaintiff's age, education, lack of work experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of day worker, laundry worker, and kitchen helper. Id. at 45; see also id. at 80-81 (VE testimony). As a result, the ALJ found that Plaintiff is not disabled. Id. at 46.

Plaintiff argues that "the ALJ failed to discharge his heightened duty to assist the pro se Plaintiff in presenting his claim for continued benefits as a disabled adult." Doc. 25 at 6. Specifically, Plaintiff complains that the ALJ (1) erred in failing to find

Plaintiff's intellectual disorder medically determinable, (2) disregarding the evidence of Plaintiff's severely diminished functioning in school, (3) disregarding the testimony of Plaintiff's witness, (4) failing to obtain Plaintiff's mental health treatment records, and (5) failing to incorporate all of Plaintiff's credibly established limitations in the RFC assessment. Id. at 8-20. Defendant responds that the ALJ "went to great lengths to aid [Plaintiff] in developing the record . . ., fully discharg[ing] his heightened duty [to an unrepresented claimant]." Doc. 26 at 7. In addition, Defendant argues that the ALJ properly considered Plaintiff's intellectual disorder and the record evidence, and that the decision is supported by substantial evidence. Id. at 11-16. Plaintiff filed a Reply. Doc. 27.

**B. Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on October 16, 2001. Tr. at 85. At the hearing, Plaintiff testified as follows. He completed the twelfth grade in special education classes, with a one-on-one aide. Id. at 64-65. In 2020, Plaintiff worked at Taco Bell but left that job because his "hours [were] horrible and they [weren't] paying [him] the right amount." Id. at 63. While in school, Plaintiff took medication that helped him focus but has not been prescribed those pills since 2020. Id. at 65.

In describing a typical day, Plaintiff said, "my day is like all over the place." Tr. at 66. Plaintiff detailed his routine with Stanzah Green, Plaintiff's aide, who provides structure to his day. Id. According to Plaintiff, without Ms. Green, he is "just going to have a crazy stressful day all over the place." Id. Ms. Green has "to remind [him] to take a shower because like sometimes [he will forget]," but she does not assist him with

cleaning himself. Id. at 69-70. Plaintiff will clean around the house, but when he gets sidetracked, he is "done cleaning in the snap of a finger." Id. at 69. Plaintiff's friends are his mother and Ms. Green because he does not keep in contact with people from school or his previous relationships. Id. at 66, 69.

Additionally, Ms. Green testified at the administrative hearing. Tr. at 71-78. When the ALJ questioned Ms. Green about her time working with Plaintiff, she said that she usually sees him three times a week and inspects the house on the fourth day. Id. at 74. Ms. Green also stated that she "[has] to call on the days that [she] is not there because [she and Plaintiff's mom are working] on trying to get him to remember to do stuff." Id. at 73. She provides Plaintiff with a posterboard of expected weekly tasks so he remembers them when she is not there. Id. at 76. Ms. Green said that Plaintiff interacts with others but "as far as like hanging out and stuff, like [he is] nowhere even close . . . because he's just not comfortable." Id. When asked whether Plaintiff has difficulties getting along with others, Ms. Green stated that "[she] wouldn't say that he [doesn't] get along with other people." Id. Ms. Green also noted that she is trying "really hard to get him on medication" but the pandemic made it more difficult to obtain a prescription. Id. at 78.

Finally, a VE testified at the administrative hearing. Tr. at 79-82. The ALJ asked the VE to consider someone of Plaintiff's age, education, and background, who is limited to performing simple, routine, and repetitive tasks in a slow-paced work environment with few changes. Id. at 80. The VE testified that such an individual could perform as a day worker, laundry worker, or kitchen helper. Id. Additionally, the VE said that if the

same individual was limited to only occasional required interpersonal interactions with others, the above jobs could still be performed. Id. at 81. When the ALJ questioned the VE regarding an employee being off task, the VE clarified that an employer would tolerate this behavior up to nine percent of the normal workday. Id. Further, the VE testified that an employer would tolerate impairment related absences about one day per month. Id. Based on the VE's testimony, the ALJ found that Plaintiff was not disabled. Id. at 45-46.

### C. Medical Evidence Summary

#### 1. Treatment Providers

The Crozer Chester Medical Center ("Crozer Center") reported that Plaintiff attended a standard early intervention program from the ages of three to five for speech delays. Tr. at 488-89. Beginning in 2008, Crozer Center also indicated that Plaintiff suffered two behavioral meltdowns, leading to inpatient treatment at Belmont Behavioral Health in 2011, and Erie County Medical Center in 2012. Id. at 488. Additionally, Crozer Center noted that Plaintiff began receiving wraparound services[5] in 2008. Id.

While there is a record indicating that Plaintiff attended appointments at Crozer Center from July to October of 2014, tr. at 504, the first full psychiatric evaluation

[5]"Wraparound services, also referred to as Behavioral Health Rehabilitation Services (BHRS), are individualized mental health services . . . provided by trained staff working one-one-one with your child to help with emotional or behavioral problems such as poor anger management or trouble getting along with other children." See chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.phlp.org/uploads/attachments/ck33h5j3h06zv51u8tvkn9saf-wraparound-services-guide-2011.pdf (last visited July 22, 2026).

contained in the record is dated November 11, 2014. Id. at 487-92. Khin Khin, M.D., evaluated Plaintiff and diagnosed him with ADHD, Learning Disorder not otherwise specified ("NOS"),[6] and Oppositional Defiant Disorder ("ODD").[7] Id. at 491-92. Dr. Khin prescribed Plaintiff clonidine transdermal patches[8] and recommended continuing special education. Id. at 492. At the follow-up appointment on January 14, 2015, Dr. Khin additionally added Daytrana[9] to Plaintiff's regimen. Id. at 512.

In the treatment notes for May 7, 2015, Dr. Khin listed Daytrana as his only medication. Tr. at 508. On August 3, 2015, Dr. Khin reported that Plaintiff took his

[6]In the prior version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-4-TR"), Learning Disorder NOS (315.9) is a category "for disorders in learning that do not meet criteria for any specific Learning Disorder, [which] significantly interfere with academic achievement." DSM-4-TR, at 56. In the current edition of the Diagnostic and Statistical Manual of Mental Disorders, ("DSM-5-TR"), Learning Disorder appears in the Neurodevelopmental Disorders section and there is no listing for Learning Disorder NOS. However, the symptoms and description of Learning Disorder NOS align closely with Unspecified Neurodevelopmental Disorder in the DSM-5-TR. See DSM-5-TR, at 99 (defining Unspecified Neurodevelopmental Disorder as "impairment in social, occupational, or other important areas of functioning [that] predominate but do not meet the full criteria for any of the disorders in the neurodevelopmental disorders diagnostic class").

[7]ODD is a disruptive, impulse-control, and conduct disorder featuring frequent and persistent patterns of "anger/irritable mood, argumentative/defiant behavior, or vindictiveness." DSM-5-TR at 522.

[8]Clonidine is used to treat hypertension by decreasing levels of certain chemicals in the blood, allowing the blood vessels to relax and the heart to beat more slowly. An extended-release tablet is used to treat ADHD. See https://www.drugs.com/clonidine.html (last visited July 23, 2026).

[9] Daytrana (methylphenidate patch) is used to treat ADHD by affecting chemicals in the brain and nerves that contribute to hyperactivity and impulse control. See https://www.drugs.com/daytrana.html (last visited July 23, 2026).

medication daily rather than just on weekdays and continued to behave well in school. Id. at 507. In December of 2015, Plaintiff expressed frustration with obtaining the proper dosage of medication due to insurance and pharmaceutical delays. Id. Plaintiff's last appointment with Dr. Khin was on February 10, 2016, during which his mother reported that insurance finally covered the medication up to the 10-milligram patch and Plaintiff improved while on medication. Id. at 503.

On February 10, 2016, Jessica Ratner, LSW, saw Plaintiff and his mother for their first family therapy appointment. Tr. at 500. During the appointment, Plaintiff's mother observed that while medication helped his behavioral problems, he needed someone to watch him most of the time. Id. at 501. Though the record indicates that Plaintiff intended to attend more therapy and medication appointments, there are no further records after this date.[10] Id.

2. School Records and Teacher Questionnaires

Plaintiff's record also contains extensive school reports and teacher questionnaires. On December 12, 2014, Chester Community Charter School ("Chester

[10]It appears that additional treatment records are not included in the administrative record. For example, the record indicates that Cornell Abraxas Group, Inc. ("Abraxas") treated Plaintiff from November 9, 2019, to at least November 5, 2021. Tr. at 716. When the Bureau of Disability Determination ("BDD") sent Abraxas a medical records request on November 5, 2021, Abraxas refused to deliver records because it would not accept the Plaintiff's electronic signature for record release. Id. at 717-20. When BDD sent another letter on November 19, 2021, Abraxas never responded. Id. 723-24. Additionally, on January 20, 2023, Plaintiff completed the Remote Hearing Agreement Form, in which he noted that he was treated at Merakey and they had prescribed medications. Id. at 175. However, there are no records from Merakey explaining the type and extent of treatment.

Community") implemented an Individualized Education Plan ("IEP") for Plaintiff. Tr. at 537. Chester Community indicated that Plaintiff operated at below average speech and language skills and recommended speech and language therapy once a week. Id. Plaintiff initially received direct occupational therapy services twice per month, but Chester Community eventually reduced these appointments to once per month. Id. at 538.

The IEP implemented on March 11, 2015, from Silver Spring Martin Luther School ("Martin Luther"), is contained in the record. Tr. at 527-75. Martin Luther determined that Plaintiff possessed severe emotional and behavioral problems, had regressed in math and reading, and was performing below his expected grade level. Id. at 570. By November 27, 2015, Martin Luther reported that Plaintiff's ability to remain focused on challenging assignments/tasks had regressed. Id. at 559. The school decided that Plaintiff needed full-time special education services for 80% or more of the school day for emotional support. Id. at 573.

On March 14, 2016, Carliss McWhite completed a Teacher Questionnaire attesting to Plaintiff's limitations. Tr. at 300-11. Plaintiff was 14 years old with a reading level of sixth grade and math level of fifth grade. Id. at 304. In the domain of acquiring and using information, Ms. McWhite reported that Plaintiff had "a very serious problem" in all categories. Id. at 305.[11] She noted that Plaintiff needed extra help "in all areas during

[11]In determining whether a child meets or equals one of the Listings relevant to the consideration of a child's claim for benefits, Defendant must assess the child claimant's functioning in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and

instruction" and his "extremely short attention span interfer[ed] with his learning." Id. In attending and completing tasks, Ms. McWhite noted that Plaintiff had "a serious problem" in nearly every category. Id. at 306. She noted that Plaintiff "requires continuous prompts to focus and complete assignments." Id. In interacting and relating with others, there were areas where Plaintiff had only a slight or no problem, but also areas with serious or very serious problems. Id. at 307. Ms. McWhite rated Plaintiff's problem "with being responsible for taking needed medications" as "a very serious problem." Id. at 309. Ms. McWhite noted that Plaintiff was "more compliant and agreeable in following simple directions" after taking his medication. Id. at 310.

Finally, Valley Day School ("Valley Day") also provided relevant school records for Plaintiff's claim. Tr. at 595-674. On February 9, 2018, Valley Day reevaluated Plaintiff's IEP. Id. at 601. On the Wechsler Intelligence Test for Children ("WISC-IV"),[12] Plaintiff tested "[s]ignificantly [b]elow [a]verage" on verbal comprehension, processing speed, and the full scale IQ; and "[w]ell [b]elow [a]verage" in perceptual reasoning, working memory, and the general ability index. Id. at 603. Valley Day concluded that Plaintiff's emotional disturbance disability and speech or language

---

manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b).

[12]The WISC-IV is an intelligence test that measures a child's cognitive ability between the ages of 6-years and 16-years, measured with a standardized mean of 100 and standard deviation of 15. See Rapson Gomez et al., Structure of the Wechsler Intelligence Scale for Children—Fourth Edition in a Group of Children with ADHD, Nat'l Libr. of Med. (May 30, 2016. See https://pmc.ncbi.nlm.nih.gov/articles/PMC4884732/. (last visited Jul. 28, 2026).

impairment required specially designed instructions. Id. at 609. Valley Day noted that Plaintiff had difficulty focusing, was hyperactive, and that medication compliance was important to Plaintiff's success. Id.

3. Consultative Examiners and State Agency Physicians

During the continuing disability review ("CDR") process in 2016, utilizing the standards for considering childhood disability, John Gavazzi, Psy.D., a consultative examiner, completed a childhood disability evaluation form on March 8, 2016, to determine whether Plaintiff who was 14 years old was still entitled to disability benefits as a child. Tr. 578-83. In doing so, Dr. Gavazzi observed that Plaintiff demonstrated "signs and symptoms of ADHD, ODD, and IED [Intermittent Explosive Disorder], which resulted in functional limitations across multiple domains."[13] Id. at 583. Thus, Dr. Gavazzi concluded that Plaintiff remained disabled. Id.

In conjunction with the redetermination of Plaintiff's disability when he turned 18 years old, on August 10, 2020, consultative examiner Gregory Kramer, Ph.D., completed a mental status evaluation Tr. at 686-91. Plaintiff told Dr. Kramer that "he used to go to [Crozer Community], [but] they closed, and he has been looking for a new medical provider." Id. at 689. Dr. Kramer noted that Plaintiff took public transportation, could manage his own money, and was social "with his girlfriend and friends." Id. at 690. On

[13]IED is defined as recurrent behavioral outbursts representing a failure to control aggressive impulses by either verbal or physical aggression. DSM-5-TR at 527. IED can be diagnosed in addition to ADHD or ODD when "recurrent impulsive aggressive outbursts are in excess of those usually seen in these disorders and warrant independent clinical attention." Id.

mental status exam ("MSE"), Dr. Kramer noted Plaintiff's motor behavior was hyperactive and found Plaintiff's attention, concentration, and recent and remote memory were mildly impaired "due to focus issues." Id. Dr. Kramer diagnosed Plaintiff with unspecified ADHD and recommended psychiatric intervention. Id. at 691. In a Medical Source Statement, Dr. Kramer found Plaintiff had no limitation in the abilities to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; and mild limitation in the abilities to understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, and interact with the public, coworkers, and supervisors. Id. at 692.

On August 25, 2020, at the initial review stage of Plaintiff's age 18 redetermination, Paul Thomas Taren, Ph.D., found from his review of the records that Plaintiff suffered from ADHD, which caused mild limitation in his ability to interact with others, and moderate limitation in his abilities to understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage oneself. Tr. at 88-89. Dr. Taren opined that Plaintiff "would be able to understand, recall and carry out simple instructions. He would be able to abide by a routine and endure the demands and changes of a typical task-oriented setting." Id. at 93. Dr. Taren further opined that Plaintiff was moderately limited in his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods." Id. at 92. Importantly, Dr. Taren considered Dr. Kramer's opinion and noted that Dr. Kramer "did

not have access to school records at [the] time of [his] exam and underestimates the severity of [Plaintiff's] cognitive limitations." Id. at 90.

On February 17, 2022, Shelley Ross, Ph.D., found from her review of the records that Plaintiff suffered from borderline intellectual functioning, but found that there was "insufficient evidence to determine the degree of impairment in [concentration, persistence and pace], [activities of daily living,] and social functioning to establish an ongoing [medically determinable impairment]." Id. at 97. On August 24, 2022, Dawn Marie Long Psy.D., found that Plaintiff suffered from borderline intellectual functioning, ADHD, and speech and language impairment. Id. at 102. However, Dr. Long indicated that "[u]pdated evidence [is] needed to assess severity." Id. at 102.[14]

**D. Claims**

Plaintiff's overarching argument focuses on the ALJ's failure to discharge the heightened duty to assist a pro se plaintiff in developing the record. Doc. 25 at 6-8. In addition, Plaintiff complains that the ALJ erred by failing to: (1) find his intellectual disorder medically determinable and severe and overestimated his RFC as a result, (2) consider the evidence of Plaintiff's diminished functioning in school, (3) properly consider the testimony of Ms. Green, (4) obtain all of Plaintiff's mental health treatment

[14] A Disability Hearing Officer also evaluated Plaintiff's records. Tr. at 100-03. However, it appears that the Disability Hearing Officer is a single decision-maker ("SDM"), a non-physician disability examiner. Tr. at 103. "[A] SDM's RFC assessment is not to be accorded any evidentiary weight when an ALJ is deciding a case at the hearing level." Saez v. Colvin, 216 F. Supp. 3d 497, 506 n.1 (M.D. Pa. 2016); see also Green v. Kijakazi, Civ. No. 21-5269, 2023 WL 4315141, at *5 n.12 (E.D. Pa. Jun. 30, 2023) (same). Here, the ALJ did not rely on the Hearing Officer's assessment.

records, and (5) incorporate all of Plaintiff's credibly established limitations in the RFC assessment. Doc. 25. Defendant responds that the ALJ complied with his duty to develop the record, encouraged Plaintiff to obtain counsel, properly considered Plaintiff's intellectual disorder, and that the ALJ's decision is supported by substantial evidence. Doc. 26. Plaintiff filed a reply providing further support for his claims. Doc. 27.

Several of Plaintiff's claims stem from the ALJ's allegedly flawed consideration of the evidence intertwined with an alleged evidentiary insufficiency. With respect to the consideration of medical opinion evidence, the governing regulations focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. § 416.920c(a). The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship (including the length and purpose of the treatment and frequency of examinations), specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program. Id. § 416.920c(c). The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others. Id. § 416.920c(b)(2). The regulations explain that supportability means "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." Id.

§ 416.920c(c)(1). In addition, consistency means "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be." Id. § 416.920c(c)(2).

The Third Circuit has held that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)). When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

In this case, the conflict in the evidence does not arise from a difference of opinion regarding the limitations imposed by Plaintiff's impairments. Rather the conflict is whether there was sufficient evidence to undertake the analysis. See Chalfant v. Comm'r of Soc. Sec., Civ. No. 20-1719, 2022 WL 838118, at *6 (M.D. Pa. Mar. 21, 2022) (citing Neifert v. Saul, Civ. No. 20-453, 2020 WL 6585897, at *16-17 (M.D. Pa. Nov. 10, 2020) (finding a state agency statement that the record is insufficient to formulate work-related limitations is a medical opinion)); see also Torres v. Saul, Civ. No. 19-1577, 2021 WL 280066, at *3 (M.D. Pa. Jan. 4, 2021) (remanded where ALJ failed to consider opinion that intelligence and psychiatric evaluations were needed to determine the extent of claimant's limitations), approved and adopted, 2021 WL 269192 (M.D. Pa. Jan. 27, 2021).

Here, the ALJ found consultative examiner Kramer's findings of no limitation in handling simple instructions and mild limitation in handling complex instructions and all interaction "somewhat persuasive." Tr. at 44. In doing so, the ALJ noted that Plaintiff's subjective allegations and the evidence provided by Ms. Green and Plaintiff's mother "resulted in a somewhat greater measure of impairment-related limitation." Id. Similarly, the ALJ found psychological consultant Dr. Taren's opinion that Plaintiff could understand, recall, and carry out simple instructions and routine tasks to be "somewhat persuasive," again noting that Plaintiff's subjective allegations and the evidence provided by Ms. Green and Plaintiff's mother "resulted in a somewhat greater measure of impairment-related limitation." Id. at 44.

The ALJ's reliance on these doctors' opinions to the exclusion of other evidence and opinions is problematic. First, Dr. Kramer did not have the benefit of Plaintiff's school records. See tr. at 90 (Dr. Taren – "Dr. Kramer, it is notable, did not have access to school records at time of exam and underestimates the severity of cognitive limitations."). In particular, Plaintiff's full scale IQ score of 60 is contrary to Dr. Kramer's finding that Plaintiff had "average intellectual functioning." Id. at 690. The relevant Listing specifically states that a Full Scale IQ score of 70 or below qualifies as evidence of "[s]ignificantly subaverage general intellectual functioning." 20 C.F.R. Pt. 404, Subpt. P., App.1 § 12.05(b)(1)(A).

Second, the ALJ did not independently consider the school records, which, as previously mentioned, included a Full Scale IQ Score of 60. Tr. at 603. The ALJ found the requirements for Listing 12.05 were not met in part because Plaintiff "does not have .

. . significantly subaverage general intellectual functioning." Id. at 42. However, as stated previously, the Full Scale IQ score of 60 qualifies as evidence of "[s]ignificantly subaverage general intellectual functioning." 20 C.F.R. Pt. 404, Subpt. P., App.1 § 12.05(b)(1)(A). The Third Circuit requires that the ALJ provide sufficient explanation of his findings to permit meaningful review. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000); see also Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) ("the function of Burnett is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review"); Rutherford, 399 F.3d at 554 (ALJ may not reject evidence for no reason). The ALJ's failure to acknowledge the educational records and IQ scores leaves the court to question whether the ALJ considered the evidence and rejected it or if the ALJ overlooked the evidence.

Third, the ALJ failed to consider the conclusions of Drs. Ross and Long, the state agency physicians who had most recently reviewed Plaintiff's records at the time of the administrative hearing. On February 17, 2022, Dr. Ross found "[t]here are no recent [mental health] records in the file. Therefore[,] there is not enough evidence in the file to evaluate [Plaintiff's mental health] allegations. There is insufficient evidence to determine the degree of impairment in [concentration persistence and pace, activities of daily living,] and social functioning to establish an ongoing [medically determinable impairment]." Tr. at 97. On August 24, 2022, Dr. Long concluded that "[t]he available medical evidence is insufficient to evaluate the severity of functional limitations resulting from mental health impairments." Id. at 106. The ALJ neither acknowledged nor addressed these findings. Thus, the ALJ's assessment is not consistent with the most

recent medical opinion evidence from two state agency mental health physicians. See Neifert, 2020 WL 6585897, at *16-17 (conclusion that record is insufficient is a medical opinion); Torres, 2021 WL 280066, at *3 (remanded where ALJ failed to consider opinion that intelligence and psychiatric evaluations were needed to determine the extent of claimant's limitations). Again, the court does not know if the ALJ rejected the conclusions of Drs. Ross and Long or overlooked them. See Burnett, 220 F.3d at 119-20 (requiring sufficient explanation of findings); Rutherford, 399 F.3d at 554 (ALJ may not reject evidence for no reason).

The evidentiary gap identified by Drs. Ross and Long could have been rectified with an updated consultative examination.[15] The evidentiary gap is further complicated because there are references to relevant treatment/school records that are not contained in the administrative record. First, Defendant attempted to obtain records from Cornell Abraxas Group, Inc., for services from November 9, 2019 to November 5, 2021. Tr. at 716. Abraxas responded that they would not accept an electronic signature. Id. at 717. It

[15]The ALJ noted that "[a] subsequent consultative psychological examination was cancelled due to the claimant's failure to cooperate in the scheduling of the examination." Tr. at 43 (citing id. at 438-58). The Exhibit cited by the ALJ includes a call log noting two attempts to reach Plaintiff on July 20 and July 23, 2022, and multiple copies of a letter dated July 25, 2022, asking Plaintiff to call regarding the scheduling of a consultative examination. Id. It appears that Defendant attempted to fax the letter multiple times to the same phone number. Id. The Case Development Worksheet shows Plaintiff responded to the July 25, 2022 letter by calling, as directed in the letter, on August 22, 2022, and leaving a voicemail on August 23, 2022. Id. at 737. Attempts to return the call failed because Plaintiff's phone was no longer in service. Id. On August 30, 2022, Plaintiff left another voicemail asking for a call back, providing the number for his girlfriend's phone because he lost his phone. Id. No further attempts to contact Plaintiff are noted in the Worksheet.

is unclear why the ALJ did make a further attempt to procure these records after the administrative hearing. Additionally, when Plaintiff completed the Covid-19 Remote Hearing Agreement Form on January 20, 2023, he indicated that he had recently been evaluated at Merakey and been prescribed medication. Id. at 175. There does not appear to have been any attempt to obtain treatment records from Merakey.

Defendant responds that the ALJ complied with his duty to develop the record by advising Plaintiff of his right to representation, the availability of such legal services, and by going "to great lengths to aid [Plaintiff] in developing the record" by questioning Plaintiff and his home health aide about his impairments, and by advising Plaintiff prior to the hearing that he needed to "inform [the agency] about or submit all evidence known to [him] that relates to whether or not [he was] . . . disabled." Doc. 26 at 7 (quoting tr. at 160). Defendant also argues that the reference to treatment at Merakey was buried in a Covid-19 Remote Hearing Agreement Form and Plaintiff did not specify that the evidence was missing from the record. Id. at 8.

I disagree with Defendant's conclusion in the circumstances presented in this case.

> "ALJs have a duty to develop a full and fair record in social security cases[.]" Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995). This duty is heightened when a claimant appears pro se. In those circumstances, "the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2006) (internal quotation marks and citations omitted). This is particularly so where the claimant has alleged a mental health impairment. See Plummer v. Apfel, 1486 F.3d 422, 434 (3d Cir. 1999). "When an ALJ 'has failed to exercise his authority to attempt to fill significant evidentiary gaps that are material to the disability determination,' remand is

> appropriate." Rosa v. Colvin, 956 F. Supp.2d 617, 622 (E.D. Pa. 2013) (citations omitted).

Kaiser v. Bisignano, Civ. No. 24-2209, 2025 WL 2024496, at *5 (M.D. Pa. Jul. 18, 2025).

Here, Plaintiff appeared pro se at the hearing. Tr. at 58. Considering that state agency physicians who had most recently reviewed the records found that Plaintiff suffered from borderline intellectual functioning, id. at 97, 106, and that Plaintiff's academic records evidenced IQ testing in the well below average and significantly below average ranges, id. at 603, it is unclear if Plaintiff appreciated the importance of having counsel at the administrative hearing. Moreover, the ALJ should have recognized an evidentiary gap based on the conclusion of the two most recent state agency physicians who determined that the evidence was insufficient to determine the limitations imposed by Plaintiff's mental health impairments.

For all of these reasons, I remand the case for further consideration of Plaintiff's psychological impairments. Defendant should attempt to obtain records regarding Plaintiff's recent treatment, the records from Abraxas and Merakey discussed previously, and obtain an updated consultative examination to fill the evidentiary gap noted by Drs. Ross and Long. Defendant should reconsider Plaintiff's school records and the evidence provided by his health care aide and his mother, in light of the updated treatment records and consultative psychological examination.

## IV. **CONCLUSION**

The ALJ's decision is not supported by substantial evidence. He neglected to acknowledge or address Plaintiff's school records and the opinion of two state agency physicians that the evidence was insufficient to determine the limitations attributable to Plaintiff's psychologically based impairments.

An appropriate Order follows.